**UNITED STATES of America**

v.

**Harold EPSTEIN.**

**Cr. No. 19035.**

United States District Court
E. D. Pennsylvania.

June 13, 1957.

**584**

G. Clinton Fogwell, Jr., U. S. Atty., Henry J. Morgan, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Jacob Kossman, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This case comes before the court on post-trial motions filed by defendant after the jury found him guilty of devising a scheme to defraud and carrying it out, through the use of the mails to send false financial statements to persons from or through whom he wished to secure credit, in violation of 18 U.S.C.A. § 1341.[1]

### I. Motion For Judgment of Acquittal

■ The uncontradicted evidence showed that defendant asked an accountant (Mr. Segal) to prepare financial statements of the condition of his retail clothing store business as of 12/-31/53 and 3/31/54 "for the purpose of procuring credit" (N.T. 75). The defendant told the accountant that these statements were to be sent to the "usual credit agencies in the trade" (N.T. 76). In preparing the statement, the accountant asked the defendant "how much stock do you have that is your own" (N.T. 84, 86) and told him that consignment merchandise should not be included in this inventory figure.[2] The defendant told the accountant to include $10,804 in inventory as of 12/31/53 and $12,500 as of 3/31/54 (N.T. 74–5). The defendant admitted on at least one occasion in February of 1954, incident to investigation of a burglary loss in his store, that 95% of the stock in defendant's store was on consignment (N.T. 90 and 38, 54). Counts of the merchandise in the store made on February 19 and April 1, 1954, indicated that the greater portion of such stock was on consignment (N.T. 70–72). The value of the defendant's own stock or inventory on March 31, 1954, did not exceed $2,000. The $12,500 inventory figure was the largest item on the March 31, 1954, statement and, with this item, the

1. The pertinent provisions of the statute are:

"Whoever, having devised * * * any scheme * * * to defraud, or for obtaining money or property by means of false * * * representations * * * for the purpose of executing such scheme * * * or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department * * * or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C.A. § 1341.

The second count of the indictment was dismissed during the trial due to improper venue (N.T. 176).

2. At N.T. 84, the accountant testified as follows on cross-examination:

"Q. Did you ask him? Did you know whether he had merchandise on consignment? A. He told me he kept consigned merchandise.

"Q. You knew. Well, did you ask him and tell him what the inventory was for his statement to eliminate not what he had? A. Yes, I did. I said, 'How much stock do you have that is your own?'"

statement showed capital of $22,585.41 (see Exhibit G-2).

Copies of these statements were given by defendant to the accountant (N.T. 76). Also, at defendant's "direction" on April 27, 1954, the accountant typed and signed a covering letter of transmittal of the March 31, 1954, statement addressed to Credit Exchange, Inc., New York City, and delivered this letter, with a copy of the statement, to defendant so he could mail it in Credit Exchange's envelope to New York City (N.T. 77-9; see G-2 and N.T. 19).

The Credit Exchange[3] received a financial statement of Harold Epstein, dated March 31, 1954, through the mail in an envelope postmarked Philadelphia, Pa., April 27, 1954. The statement was accompanied by a letter of transmittal on the stationery of Benjamin M. Segal, Public Accountant and Auditor, the letter being dated April 27, 1954, and signed by Benjamin M. Segal.[4]

It has been repeatedly held that sending of false financial statements through the mail in order to secure credit, knowing that such statements are false, is a violation of this provision of the Federal Criminal Statutes. Slakoff v. United States, 3 Cir., 1925, 8 F.2d 9; Scheinberg v. United States, 2 Cir., 1914, 213 F. 757; Bettman v. United States, 6 Cir., 1915, 224 F. 819; United States v. Yorsaner, D.C.,E.D.N.Y.1937, 20 F.Supp. 902.

Under these circumstances, the motion for judgment of acquittal must be denied.

## II. *Motion For New Trial*

Since the foregoing section of this opinion makes clear that the guilty verdict was not against the weight of the evidence, only the following three alleged grounds for new trial need be commented on in this opinion:

A. Admission of testimony given voluntarily by defendant in involuntary proceeding under Section 21, sub. a of the Bankruptcy Act before the adjudication that he was a bankrupt.

Defendant alleges that Section 7, sub. a (10) of the Bankruptcy Act, 11 U.S.C.A. § 25, sub. a (10),[5] made it error

---

3. Paragraph 2 of the written stipulation provides:
   "2. Credit Exchange is a credit checking and reporting agency. It compiles financial data and gives credit reports and recommendations with respect to the financial status of prospective purchasers to its subscribers who are manufacturers and suppliers of merchandise."

4. There was also evidence that a supplier of defendant always considered the inventory figure on a customer's statement before extending him credit and that this supplier actually did extend credit to the defendant in the summer of 1954 on the basis of figures contained in his March 31, 1954, statement which were secured from Credit Exchange, Inc. (N.T. 125-152). In view of the well-recognized principle that no proof that anyone has been deceived is necessary for commission of this crime (see Henderson v. United States, 6 Cir., 1953, 202 F.2d 400, rehearing denied, 6 Cir., 204 F.2d 126; Kreuter v. United States, 5 Cir., 1955, 218 F.2d 532, certiorari denied 349 U.S. 932, 75 S.Ct. 777, 99 L.Ed. 1262), this testimony seems irrelevant, but it does show that inflation of inventory in the statement was a scheme likely to secure credit which would not otherwise be granted. Cf., also, Durland v. United States, 1896, 161 U.S. 306, 315, 16 S.Ct. 508, 40 L.Ed. 709.

5. Section 7 of the Bankruptcy Act, 11 U.S.C.A. § 25, provides, in part, the following:
   "Duties of bankrupts
   "(a) The bankrupt shall (1) attend at the first meeting of his creditors, at the hearing upon objections, if any, to his application for a discharge and at such other times as the court shall order; * * * (10) at the first meeting of his creditors, at the hearing upon objections, if any, to his discharge and at such other times as the court shall order, submit to an examination concerning the conducting of his business, the cause of his bankruptcy, his dealings with his creditors and other persons, the amount, kind, and whereabouts of his property, and, in addition, all matters which may affect the administration and settlement of his estate or the granting of his discharge; *but no testimony given by him shall be offered in evidence against him in any criminal proceeding*, except such testimony as may be given by him in the hearing upon objections to his discharge: * * *." (Emphasis supplied.)

for the trial judge to have admitted into evidence in this criminal proceeding (N. T. 165–8), over the objection of counsel for the defendant, portions of testimony of the defendant, taken January 3, 1955, and January 10, 1955, after the filing of an involuntary petition in bankruptcy by his creditors, before a Referee in Bankruptcy at special meetings under Section 21, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 44.[6]

Although defendant was directed by the court to appear at the examination before a Referee under § 21, sub. a[7] of the Bankruptcy Act, he was under no duty to testify. He could not have been compelled to testify unless the Act makes it his duty to do so, and it is only in such instances that his testimony may be privileged.[8] Arndstein v. McCarthy, 1920, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138, affirmed 1923, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023, reaffirmed, 1924, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158; Goldstein v. United States, 5 Cir., 1926, 11 F.2d 593, certiorari denied, 1926, 271 U.S. 667, 46 S. Ct. 483, 70 L.Ed. 1141. See, also, Cajiafas v. United States, 6 Cir., 1930, 38 F.2d 3; White v. United States, 1 Cir., 1929, 30 F.2d 590; Optner v. United States, 6 Cir., 1926, 13 F.2d 11, 13.[9]

6. An involuntary petition in bankruptcy was filed against the defendant on December 29, 1954 (Bankruptcy No. 24272 in E.D.Pa.), and on that same day, a Receiver of the assets and property of the alleged bankrupt (defendant here) was appointed. On December 31, 1954, the Receiver petitioned the court for an order directing the alleged bankrupt to appear for examination pursuant to § 21, sub. a of the Bankruptcy Act. Such petition alleged, in part:

"4. That it is desirable and necessary to conduct an immediate examination of the alleged bankrupt under Section 21-A of the Bankruptcy Act for the following reasons:

"(a) The alleged bankrupt has failed and refused to turn over all of his books and records to the Receiver for examination.

"(b) The only assets that have been discovered thus far consist of a small stock of ladies' dresses of the approximate value of $1,000.

"(c) No additional assets have been discovered and it is necessary to examine the alleged bankrupt to discover the location and whereabouts of same."

An order of the court was entered that same day, directing the alleged bankrupt and his father, L. Epstein, to appear before a Referee in Bankruptcy "for examination under Section 21-A of the Bankruptcy Act, there to be examined concerning their acts, conduct and property relative to these proceedings." Such special meeting was held on January 3, 1955, adjourned, and then completed on January 10, 1955. On January 3 the meeting was prefaced by the Referee's opening remark that: "This is a special meeting under Section 21(a) for the examination of the alleged bankrupt and such other witnesses as may be called by counsel for the petitioning creditors."

Defendant was adjudicated a bankrupt on January 17, 1955. Thereafter, on March 7, 1955, schedules signed by defendant on March 4, 1955, were filed; on April 5, 1955, the first meeting of creditors was held; on June 10, 1955, the defendant waived his right to receive a discharge in bankruptcy; on June 28, 1956, a final meeting of creditors on notice was held; and on August 10, 1956, an order of final distribution was entered.

7. Section 21, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 44, sub. a, provides as follows:

"(a) The court may, upon application of any officer, bankrupt, or creditor, by order require any designated persons, including the bankrupt * * *, to appear before the court or before the judge of any State court, to be examined concerning the acts, conduct, or property of a bankrupt: * * *."

8. Cases such as Adams v. Maryland, 1954, 347 U.S. 179, 74 S.Ct. 442, 98 L.Ed. 608, where testimony given in response to a summons before a United States Senate Committee investigating crime was held not admissible in a subsequent criminal proceeding because of the express prohibition by statute, 18 U.S.C.A. § 3486, of such use of the testimony, are inapplicable since there was no requirement that plaintiff give the testimony which was offered in evidence in this case.

9. Jacobs v. United States, 1 Cir., 1908, 161 F. 694, 698–700, cited by defendant at the oral argument on this motion, does no more than state that under § 7 of the Bankruptcy Act testimony taken before the Referee when defendant had his examination as a bankrupt is not admissible

Section 7 of the Bankruptcy Act[10] details the duties of the bankrupt,[11] and any testimony of the bankrupt given at an examination under this Section, being compulsory, may be privileged.[12] But testimony under § 21 is given by the

in a subsequent criminal prosecution; but nowhere does it state that such examination of the bankrupt was made pursuant to § 21 nor does it consider whether, under § 21, it would be the bankrupt's duty, as under § 7, to give testimony at the examination.

10. See footnote 5 above.

11. It is recognized that § 7, sub. a (10) refers only to oral testimony and does not render the bankrupt's schedules inadmissible against him in a subsequent criminal prosecution. Ensign v. Pennsylvania, 1913, 227 U.S. 592, 33 S.Ct. 321, 57 L. Ed. 658; Slakoff v. United States, 3 Cir., 1925, 8 F.2d 9; Czarlinsky v. United States, 10 Cir., 1931, 54 F.2d 889. See Krotkiewicz v. United States, 6 Cir., 1927, 19 F.2d 421, 424, where the court, citing Optner v. United States, 6 Cir., 1926, 13 F.2d 11, admitted bankruptcy schedules in evidence in a later criminal proceeding, since they were signed by the defendant and had become admissions by him. See also, Podolin v. Lesher Warner Dry Goods Co., 3 Cir., 1914, 210 F. 97, 103. The dictum in United States v. Weissman, 2 Cir., 1955, 219 F. 2d 837, 841, relied on by defendant for the principle that testimony of the defendant taken under § 21, sub. a was within the immunity granted by § 7, appears to be based on the fact that the defendant had been directed by the Referee to sign the schedules in bankruptcy (and apparently had done so). The cases above in this footnote appear to view the signing of schedules as not of such dimensions as to entitle the bankrupt to the protection of § 7, sub. a (10), but this question need not be decided since the state of the record as of the time of the examination of the defendant under § 21, sub. a, as shown in footnote 6, clearly distinguishes the Weissman case on its facts. Here the schedules were not signed by the defendant until after his adjudication as a bankrupt, both of which were subsequent to the examination under § 21, sub. a, here under consideration.

See, also, In re Kaplan Bros., 3 Cir., 1914, 213 F. 753, 755, where the court found that testimony taken at the first meeting of creditors, a meeting which § 7 of the Bankruptcy Act makes it a duty for the bankrupt to attend, could be received in evidence at a later criminal prosecution if such prosecution was for perjury at the examination or punishable contempt for refusing to submit to the examination required by the Act.

12. In McCarthy v. Arndstein, 1924, 266 U.S. 34, at pages 39–40, 45 S.Ct. at page 17, the court said: The rules by which an examination of a bankrupt under § 21, sub. a, are to be governed "are, impliedly, the general rules governing the admissibility of evidence and the competency and compellability of witnesses. The section contains no indication of an intention, on the part of Congress, to take from any witness the privilege against self-incrimination. Moreover, the section makes clear the purpose not to differentiate between the bankrupt and other witnesses * * *."

The court continued to say, 266 U.S. at page 42, 45 S.Ct. at page 17:

"When the bankrupt appears before a commissioner under this section [21a], he comes, like any other person, merely to testify. In that connection he may, like any other witness, assert the constitutional privilege; because the present statute fails to afford complete immunity from prosecution. If Congress should hereafter conclude that a full disclosure of the bankrupt estate by the witnesses is of greater importance than the possibility of punishing them for some crime in the past, it can, as in other cases, confer the power of unrestricted examination by providing complete immunity. Compare Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819; Glickstein v. United States, 222 U.S. 139, 142, 32 S.Ct. 71, 56 L.Ed. 128; Ensign v. Pennsylvania, 227 U.S. 592, 33 S.Ct. 321, 57 L.Ed. 658."

The court, in the McCarthy case, further determined that the privilege was not waived either by the bankrupt's filing sworn schedules of his assets and liabilities or by his answering orally certain questions; and it is noted that the McCarthy case has been interpreted so that under Section 7 "a bankrupt could not be compelled to give incriminating testimony against himself, since the statute fails to afford complete immunity from prosecution." See editorial comment in 100 L.Ed. 537 and, also, Goldstein v. United States, supra, 11 F.2d at page 594; In re Naletsky, D.C.Conn.1921, 280 F. 437, 440–441, and cases there cited; In re Bogen, D.C.E.D.S.C.1927, 19 F.2d 935; 118 A.L.R. 608–610.

Section 7, as now worded, was amended by the Chandler Act of 1938, 52 Stat.

bankrupt as it would be by any other witness in a proceeding in which it is not made his duty to testify, and, therefore, it is not privileged.[13]

Thus, if the defendant was in fear of furnishing incriminating information against himself at the examination under § 21, sub. a, he could have then asserted his constitutional privilege and refused to answer the questions asked of him. McCarthy v. Arndstein,[14] supra. If the Referee had certified the matter for contempt proceedings to the court as the result of his refusal to answer, he could then have claimed the protection of the Fifth Amendment. Goldstein v. United States, supra.

■ B. Portion of the charge concerning the requisite intent for guilt under 18 U.S.C.A. § 1341

The trial judge charged the jury that if the inaccurate representation in the financial statement as to the inventory was made by defendant with reckless indifference as to whether it was true or false, this was sufficient intent to make the defendant guilty,[15] provided that the

847, which made an exception of "such testimony as may be given by him [the bankrupt] in the hearing upon objections to his discharge" to the general exemption in § 7, sub. a (10) that "no testimony given by him shall be offered in evidence against him in any criminal proceeding." The House Report commented that: "It has been considered wise to exclude from the immunity of the testimony of the bankrupt that testimony which he gives upon his discharge proceeding. If he refuses to answer at the discharge hearing a material question upon the ground that it might tend to incriminate him, then he should be denied the privilege of a discharge." See House Report No. 1409, on H.R. 8046, 75th Cong., 1st Sess. (1937), 25. See, also, 1 Collier on Bankruptcy, 14th Ed., p. 1008. This language, though, is not decisive as to the question of what testimony given by a bankrupt is to be considered included within the general exemption in § 7, sub. a (10).

The interpretation placed on the language of § 7, quoted in footnote 5 above, in 1920 by the Supreme Court in McCarthy v. Arndstein, supra, and the other federal courts referred to above would seem controlling since, when the Act was amended in 1926 and 1938, no attempt was made to render the bankrupt's immunity any more extensive than it had been construed by the courts in the years following 1898, when this language was inserted in the Act. See Bruce v. Tobin, 1917, 245 U.S. 18, 38 S.Ct. 7, 62 L.Ed. 123; Hecht v. Malley, 1924, 265 U.S. 144, 153, 44 S.Ct. 462, 68 L.Ed. 949; and United States v. Ryan, 1931, 284 U.S. 167, 174–175, 52 S.Ct. 65, 76 L.Ed. 224, holding that failure of Congress to change statutory language after it has been construed by the Supreme Court and other federal courts is an adoption of such construction. Cf. Zapalac v. White, D.C.S.D.Tex.1934, 9 F.Supp. 419.

13. See footnote 12 above.

14. It is clear that it is not essential to the admissibility of the prior testimony that defendant should first have been warned that what he said might be used against him, providing that such testimony was voluntarily, freely and understandingly given. See Powers v. United States, 1912, 223 U.S. 303, 313, 32 S. Ct. 281, 56 L.Ed. 448; United States v. Burdick, 3 Cir., 1954, 214 F.2d 768, 773; Turner v. United States, 4 Cir., 1955, 222 F.2d 926, 931; Scanlon v. United States, 1 Cir., 1955, 223 F. 2d 382; United States v. Block, 2 Cir., 1937, 88 F.2d 618, 620–621; Wood v. United States, 1942, 75 U.S.App.D.C. 274, 128 F.2d 265, 268–269, 141 A.L.R. 1318.

15. Defendant complains of this language (N.T. 195–6):

"It is not necessary for the Government to persuade you beyond a reasonable doubt that the defendant knew this representation was false. It is sufficient if it persuades you beyond a reasonable doubt that this representation was made with reckless indifference as to whether it was true or false. In other words, that is enough. If a representation is made by a man with reckless indifference as to whether it is true or not, that is the equivalent of making a false statement; if he does not check up on it, just tells his accountant to put a figure out of the air in there."

Immediately following this language, the charge continued as follows:

"In that connection, I am going to read you two points that the defendant has asked me to read, which are correct statements of the law, but they must be considered in connection with this principle, that a person has no right to go

other elements of the crime (mailing or knowingly causing it to be mailed, etc.) were present.

The federal courts have repeatedly held that 18 U.S.C.A. § 1341 is violated if the defendant either knows the representation is false or makes it with reckless indifference as to whether it is true or false. West v. United States, 10 Cir., 1933, 68 F.2d 96, 98; Slakoff v. United States, 3 Cir., 1925, 8 F.2d 9, 10;[16] cf. United States v. Murdock, 1933, 290 U.S. 389, 394–395, 54 S.Ct. 223, 78 L.Ed. 381;[17] Kercheval v. United States, 8 Cir., 1926, 12 F.2d 904, 908; Kaplan v. United States, 2 Cir., 1916, 229 F. 389, 390.[18]

■ C. Statement that consideration of whether defendant should be prose-cuted in state or federal courts "is a red herring."

Counsel for defendant used the following language in his opening statement to the jury (N.T. 10):

"There wouldn't be any case here if he had brought it over to Dun & Bradstreet and handed it to them. Then the creditors would have to pursue their remedy in the state court. But technically, because they say he mailed it, that case has to wind up and take up our time."

The trial judge made no mention of the possibility of the defendant's prosecution in the state court at any time during the trial or in his charge. However, after the jury had been deliberating for about two hours,[19] several ques-

---

out and make representations with reckless indifference as to whether or not they are true or false.

" 'Even if the financial statement was incorrect but was made by the defendant or his accountant in good faith, the verdict must be not guilty.'

"That is right, as long as it was not made with reckless indifference as to whether it was true.

"This also is true:

" 'If, at the time the financial statement was made, the defendant believed that inventory need not be specifically stated on the statement as being on consignment, the verdict must be not guilty.'

"That is true, but again, if he was recklessly indifferent in coming to the conclusion that he did not have to show that it was on consignment, that would be the equivalent of making a false representation."

See, also, last paragraph at N.T. 213.

16. In the West case, supra, the court said in 68 F.2d at page 98:

" * * * the jury could not find appellant guilty unless he knew they were false at the time they were made, or acted with reckless indifference as to whether they were true or false."

In the Slakoff case, supra, the court said in 8 F.2d at page 10:

"That the defendant did the acts charged is not, and cannot be, denied, but he may not be convicted and punished unless he knowingly and willfully did them with the intent to defraud and obtain credit and property. An incorrect statement, grossly misrepresenting facts, does not amount to fraud in law, unless the false representation was knowingly and willfully made with fraudulent intent [citing cases]. It was the defendant's duty, however, to make such investigation as was necessary to enable him honestly to sign and send out the statements. If he did not do this, *but acted with such gross carelessness and indifference to the truth of the representations contained in the statements as to warrant the conclusion that he acted fraudulently, then his conviction may stand."* (Emphasis supplied.)

17. In discussing "wilfulness," Mr. Justice Roberts said, in the Murdock case, supra, 290 U.S. at pages 394–395, 54 S.Ct. at page 225:

"The word often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But, when used in a criminal statute, it generally means an act done with a bad purpose [citing cases]; without justifiable excuse [citing cases]; stubbornly, obstinately, perversely [citing cases]. The word is also employed to characterize a thing done without ground for believing it is lawful [citing cases], *or conduct marked by careless disregard whether or not one has the right so to act* [citing cases]." (Emphasis supplied.)

18. In this case, the court said, 229 F.2d at page 390:

"It was defendant's duty when he certified to the truth of these statements to make the necessary investigation to enable him to do so honestly."

19. The jury was sent to lunch with the Marshal at 12:30 (having retired at 12:-

590

tions, including the following, were sent to the trial judge (N.T. 206):

> " 'In your charge, we were told that the only reason this case has come to Federal Court is because he used the mails to send this statement. If a man uses the mails for such a statement must the Government prove that the defendant had knowledge of the law governing such mailing.' "

In answering this question, the trial judge said (N.T. 207-8):

> "Now, I think maybe you have got confused by some argument that counsel made to you with what I said. You should not consider whether counsel may think this prosecution should be in the State Court or in the Federal Court. That is none of your and my concern. Congress has made this a crime. Whether it may be a crime under state law, too, or under any other law, has nothing to do with your decision here. * * *
>
> "Now, do not go off on whether or not it should be in the Federal Court or somewhere else, as counsel for the defendant indicated to you at one point in the trial. That is a red herring. This is a situation where you are to decide on whether or not what was done by this defendant fell within a statute of the United States Congress. It is not for you or me to say whether we think this should be a crime. Congress says that, and we are sworn to follow the laws of Congress."

21) and returned from lunch to resume deliberations shortly after 2 P.M. (N.T. 203).

Near the end of the supplemental instructions to the jury, after objection by counsel for defendant to the use of the term "red herring," the trial judge said (N.T. 214):

> "I want to emphasize that when I use the term 'red herring,' I am not trying to characterize the arguments of the defense counsel as foolish, because they are very good. He is an extremely able lawyer. He has presented a very good argument to you. You remember it all, and you should remember the United States Attorney's argument. All I am saying is that I do not want you to decide the thing on the fact that this might have been brought before a court somewhere else. You have got an Act of Congress that you as a jury in this court must decide on. You must decide whether it has been violated or not. That is your job."

After a careful review of the entire record, the trial judge does not believe that it is "in the interest of justice"[20] to grant a new trial because of use of the term "red herring" under these circumstances.

### Order

And now, June 13, 1957, it is ordered that (1) defendant's motion for judgment of acquittal, made April 5, 1957, is denied,[21] and (2) defendant's motion for judgment of acquittal and, in the alternative, for a new trial, filed April 8, 1957, is denied.

20. See F.R.Crim.P. 33, 18 U.S.C.A. (first sentence).
21. The court's ruling on this motion was reserved during the trial (N.T. 176).