**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Joseph H. UHRIG, Defendant-Appellant.**

**No. 17615.**

United States Court of Appeals, Seventh Circuit.

May 24, 1971.

Robert S. Bailey, Ronald P. Alwin, Chicago, Ill., for defendant-appellant.

William J. Bauer, U. S. Atty., Thomas G. Dent, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., of counsel.

Before KILEY, FAIRCHILD and PELL, Circuit Judges.

KILEY, Circuit Judge.

Defendant Joseph Uhrig and Robert Price were indicted in eight counts for using the mails in furtherance of a scheme to defraud in violation of 18 U. S.C. § 1341. At trial the government dismissed count six of the indictment. Before trial Price's motion for severance was granted. Uhrig waived a jury trial and the district court, without a jury, found him guilty and imposed a sentence of eighteen months. Uhrig has appealed. We affirm.

Uhrig was the prime mover in the incorporation, on January 23, 1963, of World Executives, Inc. (W.E.) with financial aid from Robert Springer, a retired investment counselor. Uhrig was named president, Price vice-president, and Springer secretary-treasurer. Uhrig, a highly articulate and persuasive former minister of religion, induced Springer to invest $25,000 to finance the business operation of W.E. The business, in concept, was the recruitment of executives seeking new employment and placing them with companies needing executives. Financial resources were to be Springer's investment and a predicted $12,000 gross per month from $350 each executive client was to pay upon application to W.E. Uhrig and Springer were to receive $2,000 and expenses per month.

Uhrig started quickly. He established an office in Chicago with Springer as manager and another in New York City managed by himself and Price. He traveled to Paris, France, where he arranged with John Young of World Literature Crusade, a religious charitable organization, to serve as W.E. foreign representative. Young's function, according to the evidence, was to receive and forward foreign mail addressed to W.E. Uhrig established new departments and employed department heads in Eastern United States.

Uhrig's business concept, as the district court noted, was laudable. However, his expansive activity and profligate use of W.E. money ran well ahead of his business acumen, available funds and clientele. The Chicago office was suffering from lack of executive clients, and Springer complained to Uhrig. Uhrig flew to Chicago March 1, 1963, and in Springer's presence conducted an interview with a client for the purpose of instructing Springer in the art of "hard sell" which the "changed market" now required. The "hard sell" interview upset Springer who resigned the following week, accusing Uhrig of misrepresentations and lies. Springer was repaid $7,500 of his $25,000 investment.

Now in a fiscal squeeze, Uhrig met with Price, and an educator who had earlier been hired to perform certain consulting services for W.E., and an attorney. A policy of franchising was adopted. Twenty-three or twenty-four franchises were sold in the price range of $7,500–$30,000 between June of 1963 and July of 1964. The franchisees were called "regional directors" of W.E. Application fees of franchise clients were to be divided between the "regional directors" and W.E.

Realization of Uhrig's vision, however, lagged and financial resources dwindled. In order to stimulate the market and satisfy clients and franchisees, Uhrig prepared, or caused preparation of, phonograph records, brochures and newspaper advertisements which told W.E.'s story in extravagant terms. Pressures upon Uhrig from demanding clients and franchisees forced his resignation in July, 1964.

Uhrig's later indictment charged him with devising and executing a scheme to defraud by means of false and fraudulent pretenses through use of the mails. The indictment named nine victims of the scheme, one in each of the counts. All of them testified against Uhrig. Uhrig was the only defense witness. He represented himself at trial. The district court found Uhrig guilty on eight of the counts.

Statements in the phonograph records, brochures and advertisements were alleged to be the substance of the fraudulent scheme. There was ample proof of the use of the mails in their dissemination. Uhrig contends that the material was "either true, puffing or not proven to be false." This may be so as to some statements. The court was not required, however, to take as true statements in the promotional material that W.E.'s founders had been "in the business" for fifteen years, had offices in every major city in the United States and in foreign cities; dealt with over 25,000 companies in the United States and more than a hundred overseas; had "personal contact with top executives in

many major firms and dealt directly at the top level with most major firms;" placed applicants "on almost daily basis," and refunded application fees upon placement, with companies served paying W.E. the requisite commission. Uhrig had but one year's experience in a similar business,[1] Springer had none. W.E. did not have offices in every major United States city and had no foreign offices in the sense intended by the representation.[2] W.E.'s only dealing with companies or top executives in this country or abroad was through reading standard business directories such as Standard and Poor's and Moody's, and sending résumés to, and placing telephone calls with, company executives listed in the directories.[3]

If Uhrig had placed clients on an "almost daily basis," his original dream might have come true, instead of remaining a dream. However, only five applicants seem to have been placed. The application fees and franchise purchases, plus Springer's investment, enabled W.E. to survive as long as it did. And although Uhrig's initial plan might have been for the employing companies to bear the burden of the placement fee, W.E.'s receipt of only four commissions during the life of W.E. must have made clear to Uhrig by the time the phonograph records were made in October, 1963, that these statements were false. Also Uhrig's credibility on this question is undermined by Springer's testimony that Uhrig told him at the inception of

W.E. that the primary income would be fees from executive clients and that any additional placement fees from the companies "would be gravy over and above that." There is no merit in Uhrig's contention that the proven statements were mere puffing.

There is no merit either in Uhrig's contention that the government failed to prove his intent to defraud. The question is one of fact, United States v. McCarthy, 196 F.2d 616, 619 (7th Cir. 1952), and the evidence—taken favorably to the government—of the souring of the original laudable scheme, inducing the "hard sell" and the misrepresentations were evidence of the necessary intent. Lewy v. United States, 29 F.2d 462 (7th Cir. 1928), cert. den. 279 U.S. 850, 49 S.Ct. 346, 73 L.Ed. 993. Neither are we persuaded that the evidence of Uhrig's good faith compelled the district court to find equally consistent inferences of guilt and innocence so as to preclude the guilty inference.

Finally we see no denial of Uhrig's constitutional rights to effective trial counsel and to due process. Uhrig conducted his own trial and waived a jury. He is not a lawyer. Before trial the district court judge tried to "get counsel" for him. He refused, insisting that he wanted to represent himslf. This was his right under 28 U.S.C. § 1654.[4] The judge complied with Rule 44, Federal Rules of Criminal Procedure.[5] At one pre-trial hearing the

---

1. Uhrig worked for National Executives Search, an executive placement firm, from late 1961 to December, 1962. Prior to that time, he had conducted a religious counseling television program and had worked as a minister in various churches. This, presumably, is the explanation for other statements in the brochures referring to Uhrig's fifteen years of experience "in the field of human relations."

2. The twelve European addresses used by W.E. were offices of World Literature Crusade, whose contract with W.E. limited it to receiving, translating into English, and forwarding to W.E. any mail it may have received addressed to W.E. and to maintaining W.E. literature for distribution to inquirers. Personnel at these

offices were specifically precluded from soliciting executive or corporate clients on behalf of W.E.

3. Witness Carlton, a W.E. employee, did testify on cross-examination of seven specific firms with which the company did directly deal, but these were not "major firms," much less "most major firms."

4. § 1654 provides:
   "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel. * * *"

5. Rule 44 reads, in relevant part:
   "If the defendant appears in court without counsel, the court shall advise him of his right to counsel and assign

judge pointed out the difficulty a non-lawyer would have with evidentiary rules, and sought to protect him. "You do not know what you are into * * * you may feel competent but * * *." At a later hearing the judge advised Uhrig of the possible penalties should Uhrig be found guilty. He told Uhrig he would not have to pay attorney's fees and arranged for the director of the Criminal Justice Act in the court district to offer services to Uhrig, but Uhrig persisted in exercising his right of self-representation. The judge expressly declined to force counsel upon Uhrig, was extremely patient in protecting him during the five day hearing and afforded him every opportunity to present his evidence effectively, even waiving certain evidentiary rules. At the close of trial he commended Uhrig's performance in conducting his own trial. Surely this record shows no abuse of discretion and precludes any notion that Uhrig's waiver of his Sixth Amendment right was not knowingly or intelligently made or that he was denied due process of law. *See* Lowe v. United States, 418 F.2d 100, 103 (7th Cir. 1969).

For the reasons given, the judgment is affirmed.

counsel to represent him at every stage of the proceeding unless he elects to proceed without counsel or is able to obtain counsel.