**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**K. C. EDWARDS, a/k/a Kermit Edwards, et al., Defendants-Appellants.**

**No. 71–1283.**

United States Court of Appeals, Fifth Circuit.

On Suggestion for Hearing En Banc Nov. 19, 1971.

Decided April 17, 1972.

Rehearings and Rehearing En Banc Denied June 5, 1972.

---

R. B. Jones, Birmingham, Ala., for Huie.

J. Carter McFerrin, McFerrin, Corley, Church & Garrett, Birmingham, Ala., for Edwards.

John S. Tucker, Jr., Birmingham, Ala., for Moore.

Fred Blanton, Jr., Birmingham, Ala., for Huie and Moore.

Wayman G. Sherrer, U. S. Atty., Melton L. Alexander, John S. Salter, Asst. U. S. Attys., Birmingham, Ala., for United States.

## ON SUGGESTION FOR HEARING EN BANC

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

No Judge in regular active service on the Court having requested that the Court be polled on hearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Hearing En Banc is denied.

Before THORNBERRY, COLEMAN and INGRAHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

Defendants appeal from their conviction and sentence on an indictment charging them with a conspiracy to defraud by use of the mails in violation of Title 18, U.S.C.A., Section 371, and six counts of mail fraud in violation of Title 18, U.S.C.A., Section 1341.[1] We affirm.

1. The statute provides as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or pro- cure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository

The several members of the conspiratorial cast involved in the instant case require a brief identification. Defendant Edwards is an ex-attorney, disbarred from the practice of law on May 2, 1969,[2] for violating an Alabama rule of ethics forbidding attorney involvement in securing Alabama divorces for known nonresidents. Defendant Huie is also an ex-attorney, disbarred for similar violations of the same rule of ethics on March 4, 1967.[3] Defendant Moore was Circuit Judge for the Twenty-Fifth Judicial Circuit of Alabama during the time in question. Charges were brought against Judge Moore in 1964 for his activities in granting over 5,000 divorces to nonresidents. The proceedings were enjoined, however, because the rules of ethics were held inapplicable to a sitting judge. Lawanda Smith and Annette Cox were secretaries for Huie and Edwards during the period in which defendants were engaged in the activities in question. All these individuals were named as defendants in each of the seven counts except Judge Moore, who was named only as a conspirator in Count I. Before trial, Smith and Cox pleaded nolo contendere; the others were found guilty on each of the counts charged.

The tale of defendants' downfall must begin with a short history of Alabama "quickie" divorces, divorces granted by an Alabama circuit judge, sitting in equity, in reliance upon a proviso added to the Alabama divorce laws in 1945, known as the Hooten Amendment. The pertinent language of this statute is as follows:

When the defendant is a nonresident, the other party to the marriage must have been a bona fide resident of this state for one year next before the filing of the bill, which must be alleged in the bill and proved; *provided however, the provisions of this section shall not be of force and effect when the court has jurisdiction of both parties to the cause of action.*

Code of Ala., Tit. 34, § 29 (1959).

As a result of this amendment, many attorneys recognized the possibility of Alabama's rivaling Reno for the title of "Divorce Capital of the World." Names of famous nonresidents began to appear with increasing frequency on the Alabama divorce rolls, with attendant publicity emanating from the communications media. In 1961, after certain members of the Alabama State Bar and its Board of Commissioners expressed concern over sordid publicity depicting Alabama as harboring a "divorce mill," an attempt was made to rid the State of its undesirable reputation. This attempt took the form of Rule 25–A of the Rules Governing the Conduct of Attorneys in Alabama.[4] Although the rule,

for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. *See* In the Matter of Edwards, 287 Ala. 86, 248 So.2d 130 (1971).

3. *See* Huie v. Board of Commissioners of the Alabama State Bar, 285 Ala. 185, 230 So.2d 514 (1970), cert. denied, 399 U.S. 905, 90 S.Ct. 2197, 26 L.Ed.2d 560 (1970).

4. The rule provides as follows:
No person heretofore or hereafter admitted to practice law in Alabama shall

(a) Knowingly or willfully make any false representation of fact to any judge, court, or jury to induce a favorable action or ruling by either;
(b) file or prosecute or aid in the filing or prosecution of any suit, cross bill, or proceeding seeking a divorce in a court in Alabama as attorney or solicitor for a complainant or cross complainant therein or serve as referring or forwarding attorney for such complainant or cross complainant with knowledge or reasonable cause to believe that neither party to such suit, cross bill, or proceeding is at the time of the filing of the bill of complaint or cross bill of complaint therein, a bona fide resident of the State of Alabama;
(c) while acting as attorney for either party in any suit for divorce in any Court in Alabama represent to any Court or conspire with any party, at-

promulgated by the Alabama Supreme Court and the State Bar Association, did not attempt to make, nor could it have made, any of the "quickie" divorces void, it did provide for the disbarment of any attorney thereafter securing a divorce for persons who he had reasonable cause to believe not to be bona fide residents of Alabama.

Several dissident attorneys, unwilling to give up a lucrative enterprise, continued their "quickie" practice in the face of the new ethics rule. One such attorney was defendant Huie, who with the help of Judge Moore had been quite successful in this particular line of work. The Alabama State Bar commenced a crackdown in 1964 to enforce compliance with Rule 25–A, and as a result Huie was disbarred for his activities on March 3, 1967.

Huie's disbarment caused a significant change in the business of Huie and Moore. Huie needed a front to continue his operations, and defendant Edwards soon evolved as his alter-ego pursuant to a handsome contingent fee arrangement. Huie now would procure the clients and Edwards would sign the papers as attorney. Edwards, however, soon ran afoul of the State Bar also and was disbarred in 1969. Proving beyond any doubt that greed is in reality the mother of invention, Huie and Edwards, at the suggestion of Judge Moore, did not allow their loss of attorney status to interfere with their activities. The ex-attorneys merely found a new means to the same end—pro se petitions, signed only by the parties to the proceeding and not by an attorney.

Though both Huie and Edwards were disbarred, they continued to pass themselves off to their out-of-state divorce prospects as licensed practicing attorneys. Thus far, however, no facts have been presented to indicate a violation of anything more serious than the Alabama ethics rules. Defendants' increased necessity to avoid public and judicial scrutiny by the Bar Committee, however, eventually created a fatal and inescapable defect in their operations which provided the basis for the instant indictments.

The testimony of the numerous witnesses at trial established that upon learning the name of either Huie or Edwards, usually from an out-of-state attorney, prospective divorcees would call or write the defendants for legal assistance in securing an Alabama divorce. This initial contact would result in a divorce "packet" being mailed to the customer. The packet contained the essential papers of a properly handled divorce—a bill of complaint, an answer and waiver of respondent, and an agreement of the parties. The customer would then bring these papers to Birmingham, Alabama for a short interview with one or more of the defendants.

In the defendants' offices were stockpiled all the necessary indicia of a valid divorce decree: thousands of blank decrees, court seals, the seal of the Register in Chancery of the Winston County Circuit Court, and rubber stamps bearing the names of Judge Moore and Lois Brewer, Register in Chancery. The prospective divorcee while in defendants' offices would choose a ground for divorce, give a bit of testimony before one of the secretaries, make the required payment, usually $465.00, and be sent home with assurances that he would be divorced soon thereafter. Upon returning home, the client would receive in the mail what purported to be a certified copy of his filed, recorded divorce decree, which was ordinarily dated the same day as his visit to Alabama.

After the client left the office, the "decree" was typed; Judge Moore's name stamped or typed thereon, the court seal embossed, and the certification made, via the rubber stamp and seal of Lois Brewer, Register in Chancery, which attested that the decree was on file and recorded in the records of the Winston

---

torney, or person to represent to the Court that either party to such suit is

a bona fide resident of Alabama, knowing such representation to be false.

County Circuit Court in Double Springs, Alabama. Approximately two or three times a month, the decrees were dispatched from Birmingham to Judge Moore's chamber by private courier. Of the approximately 2800 divorces purportedly granted during this period, at least 2700 never found their way to the Winston County Circuit Court and instead remained in Judge Moore's office.

Defendants primarily contend that the indictment charges them with activities which are solely the concern of the State of Alabama and beyond the jurisdiction of the federal district court. They argue that the indictment limits the functioning of an Alabama court of general jurisdiction on a subject squarely within that jurisdiction—domestic relations. The procedural, administrative, and ministerial functions of the Alabama courts were by this theory assaulted by necessary implication when the federal court was called on to instruct the Alabama judicial system in matters of jurisdiction, recordation, filing, reporting, and certification. Defendants' argument boils down to the contention that in order to prove fraud, the government had to prove and the jury had to find that the prospective divorcees did not receive what they bargained for. This would admittedly entail a finding that the numerous divorce decrees involved here were invalid, a matter alleged to be solely within the prerogative of the Alabama courts.

 Statutes like the federal mail fraud statute involved here must be strictly construed in order to avoid extension beyond the limits intended by Congress. Kline v. Burke Construction Company, 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922); United States v. Kelem, 9th Cir. 1969, 416 F.2d 346. A narrow, careful construction is especially appropriate where, as here, the federal statute threatens to reach criminal conduct in the field of domestic relations which the State can, and should, effectively and appropriately control. As the Supreme Court has repeatedly reiterated, Section 1341 is not designed to

reach all frauds but only those in which the use of the mails is a part, leaving all other cases to be dealt with by appropriate State law. *E. g.,* Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944). We likewise recognize, however, that the fact that a scheme may or may not violate State law does not determine whether it is within the proscriptions of the federal statute. Congress may forbid any mailing in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme itself or not. Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); United States v. Sylvanus, 7th Cir. 1951, 192 F.2d 96. Recognizing these principles, we have concluded that the record herein reveals a fraudulent scheme prohibited by the federal statute.

 The indictment in question, fairly summarized, charged the defendants with devising a scheme and artifice to defraud the various prospective divorcees through the use of the mails. Representations were allegedly made by the various defendants that any divorce obtained by a nonresident would be valid and would withstand attack in any court of the United States and that the divorce decree purchased and mailed to them would be properly signed by an appropriate Alabama judicial official and filed and recorded pursuant to Alabama state law. All these representations were allegedly false and known by the defendants to be false.

 The indictment thus charges that the prospective divorcees paid for one thing and received another. It is well recognized that any scheme to deceive as to the substantial identity of the thing received may be prohibited by the mail fraud statute, even though the item received may be, or turn out to be, as valuable as the item promised. *See* United States v. Holdsworth, D.Me.1948, 77 F.Supp. 148; United States v. Whitmore, S.D.Cal.1951, 97 F.Supp. 733. Defendants' customers in the instant case were led to believe they were receiving valid, signed, filed and recorded divorce

decrees. In fact, they were receiving unsigned, unfiled, and unrecorded decrees which, even if properly acted upon by a proper judicial officer, were of questionable validity. It is not enough for defendants to allege that the law of Alabama as to the validity of these divorces is unsettled and that no one knows whether they are valid or not. *Contra,* In the Matter of Griffith, 283 Ala. 527, 219 So.2d 357 (1969); In the Matter of McKay, 280 Ala. 174, 191 So.2d 1 (1966); Winston v. Winston, 279 Ala. 534, 188 So.2d 264 (1966); Hilley v. Hilley, 275 Ala. 617, 157 So.2d 215 (1963); Volin v. Volin, 272 Ala. 85, 128 So.2d 490 (1961); Jennings v. Jennings, 251 Ala. 73, 36 So.2d 236 (1948).[5] Defendants chose to represent to their customers that the divorce decrees were valid without question and that residency under Alabama law involved only being in the State for an hour, or even a minute.[6] Such reckless indifference to the truth of representations is more than sufficient to afford the government a remedy under the mail fraud statute. *See* Elbel v. United States, 10th Cir. 1966, 364 F.2d 127; Gusow v. United States, 10th Cir. 1965, 347 F.2d 755; Irwin v. United States, 9th Cir. 1964, 338 F.2d 770; United States v. Epstein, E.D.Pa.1957, 152 F.Supp. 583.

It is likewise not enough for defendants to urge that the ministerial inadequacies of the decrees were not really important to their customers, and that there is at least a *possibility* under Alabama law that they got all that they paid for—a divorce. The evidence of defendants' activities flies in the face of this assertion. When several of the customers became worried about the legal status of their divorce or were unable to find the original decree in the files of the Circuit Court, they were repeatedly assured by the defendants that the decrees were in fact filed and recorded and that there was thus no question as to the validity of their divorced status. These facts indicate clearly that defendants not only knew what their customers wanted but were intent upon concealing the fact that they were not getting it.

Aside from the questionable validity of these divorces in other states, as well as in Alabama, the fact of which defendants artfully concealed from their victims, we have no doubt that the evidence, without reference to Alabama legal principles, establishes that the decrees mailed to defendants' customers, at least at the time of receipt, were as worthless as a blank sheet of paper. It is clear that the government in the instant case was not trying or questioning the validity of Alabama "quickie divorces" in general, though there is considerable question as to their validity. The thrust of the government's case was instead that the customers were receiving "certified copies" of a record and proceedings which did not at the time exist.

The trial court charged the jury on this point as follows:

So, it is then that actions by the Judge of a court of record are to be reduced to writing or to a written summary, some action taken by the Judge by way of signature or placing his final stamp of approval thereon, the same then filed with the official records, and entered into such official records.

After such steps have been taken, the Judge's action has become the act

---

5. Defendants, in contending that at least the validity of these divorces is questionable, can cite only cases holding that in certain circumstances a "quickie" divorce may *become* valid through facts constituting waiver or estoppel. *See, e. g.,* Lutsky v. Lutsky, 279 Ala. 185, 183 So.2d 782 (1966); Levine v. Levine, 262 Ala. 491, 80 So.2d 235 (1955). These cases in no way refute the proposition that the divorces involved in the instant case *at the time the decrees were mailed* were not valid.

6. It is clear that any such representation under the facts of the instant case, which give no indication of domiciliary intent, is completely false. *See* Richardson v. Richardson, 258 Ala. 423, 63 So.2d 364 (1953); McCary v. McCary, 253 Ala. 468, 45 So.2d 292 (1950); Gee v. Gee, 252 Ala. 103, 39 So.2d 406 (1949).

of the Court itself, and [not] merely his personal act.

Stated another way: The decree must be in writing; so that its effect can be understood and recorded. It must be signed, *or in some way reflect that it is the decision of the court and not merely a proposed or suggested decree which may or may not have been acted upon by the Judge,* so that when it is placed in the records of the Court, it will clearly reflect that it is a judicial determination of the cause by the judicial official authorized to make that determination; and finally, it is to be filed and recorded to characterize the order or decree as to the act of the court, rather than the personal act of the person elected or appointed as Judge.

I instruct you that if you find from the evidence that a divorce decree from the Circuit Court of Winston County, or of the 25th Judicial Circuit of Alabama was not signed by the Judge of that court *and did not in some other way reflect that it was the decision of the court* and was not filed or enrolled in the records of that court, then you would be justified in finding that such a decree was not a valid divorce decree. (Emphasis added)

We believe this instruction to be eminently correct. It takes no more understanding of Alabama legal principles to determine that these pieces of paper were not decrees than it would take to determine that a horse is not a cow under Alabama law. It should go without saying that a private party may not grant a divorce in Alabama or any other State. Only judges, acting in their capacity as judges, may alter an individual's legal status. This is exactly what the evidence tended to show that Edwards and Huie, with the assistance of Judge Moore, attempted to do. There is no evidence reflected in the record that Judge Moore ever considered the petitions filed in his office, acted on them, made any sort of judicial determination, or in any other sense rendered a decree. Instead, the evidence establishes the contrary. All acts in regard to these purported decrees were made by the disbarred attorneys and their secretaries, who had no semblance of power to so act. In short, the evidence established that there was in fact no judgment, no decree, no rendition, and no judicial act whatsoever. The defendants' customers thus paid for a divorce and got nothing. These facts without a doubt establish an offense cognizable under Section 1341.

■■■■■■ Defendants next allege that they were denied due process of law because of the government's delay in bringing the indictment several years after it had obtained knowledge of the conspiracy. All acts charged in the indictment and each count thereof are specifically alleged to have occurred on specific dates well within the applicable statute of limitations, 18 U.S.C.A. § 3282. Assuming there was a delay in bringing the indictment, a fact that has in no sense been established, such a delay does not amount to a violation of defendants' constitutional rights so long as the applicable statute of limitations period is followed and no prejudice is shown. *See* United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); United States v. Judice, 5th Cir. 1972, 457 F.2d 414 (on petition for rehearing); United States v. Grayson, 5th Cir. 1969, 416 F.2d 1073, cert. denied, 396 U.S. 1059, 90 S.Ct. 754, 24 L.Ed.2d 753 (1969); Bruce v. United States, 5th Cir. 1965, 351 F.2d 318, cert. denied, 384 U.S. 921, 86 S.Ct. 1370, 16 L.Ed.2d 441 (1966).

■■■■■■ Defendants further allege that there was insufficient evidence of use of the mails in furthering the fraud with which they were charged. For a violation of Section 1341 to be made out, the government must not only prove a scheme to defraud, but also show that defendants used the mails in some way for the purpose of executing the scheme. *E. g.,* United States v. Uhrig, 7th Cir. 1971, 443 F.2d 239; United States v. Bessesen, 8th Cir. 1970, 433 F.2d 861, cert. denied, 401 U.S. 1009, 91 S.Ct. 1254,

28 L.Ed.2d 545; Blachly v. United States, 5th Cir. 1967, 380 F.2d 665. The issue of whether there is a sufficient mailing to transform a State cause of action into a federal prosecution for mail fraud involves a determination of whether the mailing was in furtherance of the scheme or was merely collateral or incidental to it. Bannister v. United States, 5th Cir. 1967, 379 F.2d 750, cert. denied, 390 U.S. 927, 88 S.Ct. 861, 19 L.Ed.2d 988 (1967); Brown v. United States, 5th Cir. 1965, 328 F.2d 652. Defendants contend that there was no solicitation by mail proven in the instant case and that the fraud, if established at all, occurred in the offices of the defendants in Birmingham, Alabama without any use of the mails. Only after the fraud was accomplished did the defendants mail the purported decrees. Defendants cite for this proposition Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) and Kann v. United States, *supra*. It is well-established that these two cases cannot be taken to hold that once a defendant has received that which he has set out to obtain through fraudulent means, no subsequent mailing can form the basis of a prosecution under Section 1341. *See, e. g.,* Adams v. United States, 5th Cir. 1963, 312 F.2d 137; Clark v. United States, 1953, 93 U.S.App. D.C. 61, 208 F.2d 840, cert denied, 346 U.S. 865, 74 S.Ct. 105, 98 L.Ed. 376 (1953); United States v. Riedel, 7th Cir. 1942, 126 F.2d 81. Facts analogous to the instant situation may be found in Kloian v. United States, 5th Cir. 1965, 349 F.2d 291, wherein the mails were not used in originally obtaining the funds through fraud but were used to lull the victims of the fraud into a feeling of

false security, thereby preventing or at least delaying the discovery of the fraud. This came about through the mailing of various documents amounting to assurances to the victims after the funds had been paid to the operators of the scheme. This Court held that such a use of the mails was an integral part of the scheme itself. In the instant case, sending the purported divorce decree was a final step in the scheme to defraud, necessary to avoid detection and to prevent the recovery of money lost by the victims and was thus a material part of the fraudulent scheme. *See* United States v. Riedel, *supra*.

 Defendants together make numerous other allegations of error which we deem unworthy of comment.[7] *See* Local Rule 21.

 Defendant Edwards separately urges two evidentiary grounds for reversal of his conviction. First, he contends that the trial court erred in admitting testimony of his committing a criminal assault on one of the prospective divorcees, which was allegedly unrelated to the charges in the indictment and introduced solely for its prejudicial effect. Joyce King, a witness for the government, testified that after giving her bit of testimony and handing in the required packet at Edwards' office, she demanded, upon advice of out-of-state counsel, that she be allowed to see the decree actually filed and recorded before paying her fee. This demand was met with an attack by Edwards and his secretary during which all of Mrs. King's papers, which had been prepared by the out-of-state attorney in preparation for the divorce action, were taken from her.

7. Defendants assert the following errors:

(1) The prosecution of the instant case violates the tenth amendment. *See* Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960).

(2) The conspiracy statute is unconstitutional.

(3) The search warrants involved in the instant case were fatally defective because they were not based on probable

cause and required a judicial determination by postal authorities.

(4) The trial court erred in its placing of the burden of proof on the issue of specific intent. *See* January v. United States, 5th Cir. 1969, 409 F.2d 31; Gurleski v. United States, 5th Cir. 1968, 405 F.2d 253, cert. denied, Smith v. United States, 395 U.S. 977, 89 S.Ct. 2127, 23 L.Ed.2d 765 (1968).
All are clearly without merit.

Assuming that this assault on Mrs. King was not in furtherance of the conspiracy and did not tend to show Edwards' knowledge of the illegal character of his activities and his specific intent to further the aim of the conspiracy, we find that the defendant clearly waived his right to object to its admissibility. Mrs. King's testimony as to the alleged assault goes on for several pages in the record without any semblance of objection from any defense attorney. Indeed, at one point, after Mrs. King stated that she had been "terrified" during the altercation, defense counsel stated:

> If the Court please, I am going to object to her own impression. *I don't object to what they did* but her statement as to her feeling and so forth, I object.

Defendant counsel thereafter proceeded to cross-examine Mrs. King fully, and then and only then did he object to the allegedly prejudicial nature of her testimony. A clearer case of waiver could not be shown.

■ Secondly, Edwards urges that the trial court erred in refusing to allow him to testify as to whether he intended to defraud anyone by his actions. There is little doubt that Edwards' intent was highly relevant to the jury's determination of whether he was guilty of fraud and conspiracy to defraud. Under such circumstances, we think justice would require that the defendant be given an opportunity to take the stand and state to the jury that he intended no wrongdoing for whatever value such a self-serving statement might have on the jurors' minds. *See* Crawford v. United States, 212 U.S. 183, 29 S.Ct. 260, 53 L.Ed. 465 (1909); United States v. Shavin, 7th Cir. 1961, 287 F.2d 647. *But cf.*, Beaudine v. United States, 5th Cir. 1969, 414 F.2d 397, cert. denied, 397 U.S. 987, 90 S.Ct. 1116, 25 L.Ed.2d 395 (1969). The government all but concedes this point in its brief.

Under the facts of the instant case, however, we find the error to be harmless beyond any reasonable doubt. *See* Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Lipscomb, 5th Cir. 1970, 435 F.2d 795; United States v. Panczko, 7th Cir. 1970, 429 F.2d 683. Edwards' contention that he had no intent to defraud was urged during both the opening statement and closing argument of his able counsel. A perusal of the 121 pages of transcript reflecting Edwards' testimony clearly indicates his contention that (1) he properly prepared all pleadings; (2) he believed that the pleadings were being properly processed in the Winston County Circuit Court by Huie; (3) each file was in his opinion legally sufficient and correct; and (4) had he known that the divorces were not being handled properly, he would have had nothing to do with them. Under such circumstances, we cannot believe that any statement by Edwards to the effect, "I did not intend to defraud these people," could have any further effect on the jury's verdict. *See also* Beaudine v. United States, *supra.*

Affirmed.

### ON PETITION FOR REHEARING

PER CURIAM:

It is ordered that the petition for rehearing filed on behalf of K. C. Edwards in the above entitled and numbered cause be and the same is hereby denied.

### ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing filed on behalf of J. Robert Huie & Bob Moore, Jr. is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.