**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William Aubrey THOMPSON, Thomas Edward Sisk, Charles Frederick Taylor, Defendants-Appellants.**

**Nos. 81–5176, 81–5490 and 81–5495.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 23, 1981.

Decided Feb. 8, 1982.

Rehearing Granted March 26, 1982.

Henry A. Martin, Haile & Martin, W. Gary Blackburn, Robert C. Watson, Nashville, Tenn., court appointed, for defendants-appellants.

Joe B. Brown, U. S. Atty., William M. Cohen, Asst. U. S. Atty., Nashville, Tenn., for plaintiff-appellee.

Before LIVELY and JONES, Circuit Judges, and PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

The defendants-appellants, through motions in arrest of judgment following guilty pleas, raise the issue whether the office of the Governor of the State of Tennessee may be an "enterprise" under Title IX of the

Organized Crime Control Act of 1970, 84 Stat. 922 (1970). This Title, one of twelve within the Act, is commonly known by the acronym RICO, from the chapter heading "Racketeer Influenced and Corrupt Organizations." 18 U.S.C. ch. 96.

The pertinent facts are as follows. Each of the appellants was connected in the mid-to-late 1970's with the office of the Governor of Tennessee. In an indictment alleging that that office "was an 'enterprise' as defined by Title 18, United States Code, Section 1961(4)," the appellants were charged with violating RICO by "selling" executive clemency and immunity from extradition through the governor's office.[1]

1. The provisions of RICO allegedly violated in this case state:
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 18 U.S.C. § 1962(c)–(d). The relevant statutory definitions provide:
 As used in this chapter—
 (1) "racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States;
 (2) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;
 (3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;
 (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
 (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;
 (6) "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;
 18 U.S.C. § 1961(1)–(6).

The appellants argue that Congress did not intend the application of RICO to such enterprises, or that if Congress did so intend, then RICO is unconstitutional. As will become clear from this opinion, it is unnecessary for us to reach the constitutional question posed by the appellants.

## INTERPRETING RICO

### A. RICO's "Plain Language."

 The meaning of the term "enterprise" within RICO has been often and hotly litigated. The Supreme Court has recently laid to rest the dispute whether wholly *illegitimate* concerns can be RICO enterprises. They can. *United States v. Turkette*, 452 U.S. 576, 580–93, 101 S.Ct. 2524, 2527–34, 69 L.Ed.2d 246 (1981).

We follow the method of interpreting statutes laid down in *Turkette.* In that case, the Court looked first to the statutory definition of "enterprise." See 452 U.S. at 580, 101 S.Ct. at 2527. The statutory definition is on its face clear and broad. " '[E]nterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity . . . ." 18 U.S.C. § 1961(4). The Court noted that this language is unambiguous in including legitimate as well as illegitimate enterprises. The statutory language itself was therefore regarded as conclusive. See 452 U.S. at 580, 101 S.Ct. at 2527. *Accord, United States v. Sutton,* 642 F.2d 1001, 1006 (6th Cir. 1980) (en banc), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3144, 69 L.Ed.2d 995 (1981). The Court in *Turkette* recognized, however, that "there is no errorless test for identifying or recognizing 'plain' or 'unambiguous' language," and that in construing statutes "absurd results are to be avoided and internal inconsistencies in the statute must be dealt with." 452 U.S. at 580, 101 S.Ct. at 2527. *See also Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978); *Commissioner v. Brown,* 380

U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965). In short, courts in construing statutes must look beyond the statutes' words not only if the words themselves are unclear, but also if a discrete statutory provision is anomalous in effect. It is, therefore, "fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, we must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy." *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962).

Application of RICO's civil remedies to state government enterprises would result in anomalous results: district courts would not only be authorized to "prohibit any person from engaging in the same type of endeavor as the enterprise engaged in . . . ," but also to order "dissolution or reorganization of *any* enterprise . . . ." 18 U.S.C. § 1964(a) (emphasis added). To hold that Congress has authorized federal district courts to dissolve or reorganize the offices of the governors of the states, and that it did so *sub silentio*,[2] is shocking and absurd.

Although the Court in *Turkette* stated that "[e]ven if one or more of the civil remedies [in RICO] might be inapplicable to a particular illegitimate enterprise, this fact would not serve to limit the enterprise concept," 452 U.S. at 585, 101 S.Ct. at 2530, that remark must be read in proper context. Given the patent concern with organized crime's economic power that engendered RICO's enactment, application of that statute to wholly illegitimate, as well as legitimate enterprises, was *a fortiori.* Such application yields no startling results. In these appeals we are not presented, as was the Supreme Court in *Turkette,* with cases in which various of RICO's civil remedies would be merely impracticable. Dissolution or reorganization of a governmental entity would certainly not be impracticable; the

---

**2.** There is no mention in RICO or in its legislative history of application to government entities.

question is whether these remedies were placed within district court's authority. If Congress may grant such authority *sub silentio*, then we have witnessed in our times the destruction of the states as sovereign political entities. *Cf. National League of Cities v. Usery*, 426 U.S. 833, 842–52, 96 S.Ct. 2465, 2470–2474, 49 L.Ed.2d 245 (1976) (Commerce Clause does not authorize Congress to force upon the states essential choices regarding conduct of integral government functions.)

B. The Legislative History of the Organized Crime Control Act.

Having decided that the application of RICO to government "enterprises" yields anomalous consequences, we proceed to examine the history of the Organized Crime Control Act to see if the legislature clearly intended these consequences. With the highest degree of certainty by which an historical "fact" can be known, it can be said that Congress did not envision the present application of RICO in passing the Organized Crime Control Act.

In arguing to the contrary, the government points out that Title IX of the Act "shall be liberally construed to effectuate its remedial purposes." Pub.L. 91–452, § 904, *reprinted in* [1970] U.S.Code Cong. & Admin.News 1073, at 1104. This language has led some courts to what we feel to be erroneous constructions of Title IX, for to determine these "broad remedial purposes" (on which Title IX itself is silent) courts have looked to the stated purposes of the entire Act.[3] The Congressional Statement of Findings and Purpose that precedes the Act reads:

> The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by un-

lawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and *to subvert and corrupt our democratic processes*; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, *threaten the domestic security, and undermine the general welfare of the Nation and its citizens*; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

> It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

84 Stat. 922–23 (emphasis added).

The emphasized phrases certainly indicate a Congressional concern over corruption of government by organized crime. *See, e.g.,*

---

**3.** This was the practice in the following cases: *United States v. Grzywacz*, 603 F.2d 682, 686–87 (7th Cir. 1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980); *United States v. Frumento*, 563 F.2d 1083, 1091 (3d Cir. 1977), *cert. denied sub nom. Millhouse v. United States*, 434 U.S. 1072, 98 S.Ct. 1256, 55

L.Ed.2d 775 (1978); *United States v. Brown*, 555 F.2d 407, 415–16 (5th Cir. 1977), *cert. denied sub nom. Seymour v. United States*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *United States v. Barber*, 476 F.Supp. 182, 184–85 (S.D.W.Va.1979).

*United States v. Angelilli,* 660 F.2d 23, 32 (2d Cir. 1981). There is, however, no cause to equate the aims of the entire Act with those of one part of it. *See United States v. Grzywacz,* 603 F.2d 682, 690 n.1 (7th Cir. 1979) (Swygert, J., dissenting), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980). The Second Circuit, although holding that RICO enterprises included government entities, was obliged to note that "the congressional discussion devoted expressly to Title IX did not state that government entities were to be the beneficiaries of RICO's substantive provisions ...." *Angelilli, supra,* 660 F.2d at 33. In other words, even though RICO is supposed to be a part of Congress's attack on organized crime's corruption of government, such corruption was never mentioned in the Congressional debate on RICO itself. Rather, corruption of government surfaced most often in the legislature's discussion of Title I of the bill, which provided for the creation of special grand juries authorized to report on the misconduct of public officers or employees. *See* 18 U.S.C. § 3333(a)(1). The remarks of Senator Byrd concerning the two titles of the bill illustrate where the legislative concern over corruption of government was expressed in the statutory scheme:

> I am especially optimistic about title I of S. 30—the special grand jury provisions. Time and time again in our history, aroused citizens have demonstrated their devotion to law and order in the face of official timidity and inaction. Prosecutors and judges may be scared or bought off, but citizens, properly empowered, can step in and do the job which their officials fail to do. I believe that title I represents the best opportunity for the average citizen to play a significant role in the war against organized crime.

> It is encouraging that title I absolutely requires the convening of special grand juries in our major metropolitan areas at least once every 18 months and assures them sufficient longevity to probe deeply into organized crime. Perhaps this provision can overcome some of the official dilly-dallying which, I believe, is partly responsible for some of the public apathy which we have witnessed toward this problem.

> These special grand juries would have the power to inquire into the violation of Federal laws and dig deeply into the activities and operations of organized crime, *including whether appropriate law enforcement officials have been properly carrying out their jobs.*

> *Significantly, these grand juries would be empowered to issue special reports concerning noncriminal misconduct, malfeasance, or misfeasance, by a public officer or employee as a basis for a recommendation of removal or disciplinary action.*

> \* \* \* \* \* \*

> Another section of the bill which merits special attention, Mr. President, is title IX.

> Recent studies of the phenomenon of organized crime, including that of the National Crime Commission, have identified its alarming expansion into the field of legitimate business as a major threat to our institutions. This penetration of legitimate business by organized crime poses two distinct but related dangers:

> First, the economic strength of the underlying illegal operations of organized crime is perpetuated and made more profitable if tainted proceeds can be safely invested in legitimate enterprises, even if those enterprises are operated in a lawful manner.

> Second, the free channels of trade are threatened by organized crime's propensity to obtain for itself monopoly control of its areas by whatever means are available, including brutal and strongarm tactics.

> The techniques and methods used in such infiltration of legitimate business enterprises are many and varied. A few case histories will demonstrate how easily a business can fall captive to its awesome power.

> \* \* \* \* \* \*

The legislative proposals contained in title IX of this act, entitled "Racketeer Influenced and Corrupt Organizations," constitute a carefully structured program which can drastically curtail—and eventually eradicate—the vast expansion of organized crime's economic power which operates outside the rules of fair competition of the American marketplace. Broadly speaking, this title would create strict criminal penalties for using the proceeds of racketeering activity characteristic of organized crime to acquire an interest in businesses engaged in interstate commerce, or to acquire or operate such businesses by racketeering methods.

In addition, this title, by utilizing remedies heretofore applicable in the antitrust field—the remedies of injunction, dissolution, divestiture, and reorganization—*would forge a powerful new weapon for putting the syndicate out of business. By removing its leaders from positions of ownership, by preventing them and their associates from regaining control, and by visiting heavy economic sanctions on their predatory business practices this legislation should prove to be a mighty deterrent to any further expansion of organized crime's economic power.*

The civil remedies of this legislation patterned after the time-tested antitrust remedies, coupled with its heavy criminal penalties, should enable the Government to take effective action to eliminate the serious threat posed to the safety and well-being of our democratic institutions by the totalitarian dictators of organized crime's closed society.

116 Cong.Rec. 606–07 (emphasis added).

Many other examples from the legislative history can be cited to show that although Congress was concerned with corruption of government by organized crime (as who is not?), RICO was aimed at organized crime's economic power. See, *e.g.*, Remarks of Sen. McClellan, 116 Cong.Rec. 591–92; Remarks of Sen. Hruska, *id.* at 602; Remarks of Sen. McClellan, *id.* at 8670; Remarks of Sen. Dole, *id.* at 36296; Remarks of Rep. Cellar, *id.* at 35196; Remarks of Rep. St. Germain, *id.* at 35200; Remarks of Sen. McClellan,

155 Cong.Rec. 9566–71 (introduction of S. 1861, predecessor of RICO's). *See also* McClellan, *The Organized Crime Act (S. 30) or Its Critics: Which Threatens Civil Liberties?* 46 Notre Dame Law. 55, 140–42 (1970).

### C. Internal Evidence of RICO's Scope.

At an earlier stage of these prosecutions, the district court (under another presiding judge) held that the enterprise element of RICO must cover government entities because two of the "racketeering activities" enumerated in § 1961 of RICO—bribery under state and federal law, and extortion under color of state law—"can only be committed in the context of governmental activity." *United States v. Sisk*, 476 F.Supp. 1061, 1062 (M.D.Tenn.1979). However, under both federal and Tennessee law, bribery can be committed by those outside of government. See 18 U.S.C. § 201; T.C.A. §§ 39–801, 39–803, 39–805, 39–809, 39–812, 39–816, 39–821, 39–824. Moreover, RICO does not contain the phrase "extortion under color of state law," but rather refers to acts indictable under the Hobbs Act, 18 U.S.C. § 1951. The Hobbs Act covers far more than extortion "under color of state law." See 18 U.S.C. § 1951(b)(2). The inclusion of bribery and Hobbs Act violations in RICO's long list of "racketeering activities" therefore does not even suggest that Congress intended "enterprises" to include government entities.

■ Our holding today does not mean that RICO cannot be used to reach corruption of government by organized outside forces. Nor do we suggest that public officials are immune from RICO actions. Rather, we hold that RICO's remedial provisions show that government entities are neither appropriate nor intended RICO "enterprises." *See* Tarlow, *RICO: The New Darling of the Prosecutor's Nursery*, 49 Ford.L.Rev. 165, 206 (1980). Following *Turkette*, the corrupting organizations may themselves be charged as RICO enterprises, and the evils Congress feared and legislated against can be fought. *See, e.g., United*

*States v. Whitehead*, 618 F.2d 523, 525 n.1 (4th Cir. 1980) (enterprise was prostitution ring protected by bribed prosecutor); *United States v. Herman*, 589 F.2d 1191, 1194 (3d Cir. 1978), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979) (enterprise was bail bonding firm that bribed magistrates).[4] It would, however, be a perversion of Congress's intent to continue to allow the potent weapons created in RICO to be lifted casually against every instance of venality in state and local governments.

## UNDER THE AVALANCHE, OR, THE VOYAGES OF "ENTERPRISE"

The district court, although inclined to grant the defendants' motions in arrest of judgment, was deterred by the "judicial momentum" toward classing government entities as RICO enterprises. The government refers to an "avalanche" of precedent adopting this rule: *United States v. Angelilli, supra*, 660 F.2d at 30–35 (2nd Cir. 1981); *United States v. Sutherland*, 656 F.2d 1181, 1198 (5th Cir. 1981); *United States v. Lee Stoller Enterprises, Inc., supra*, 652 F.2d at 1316–19 (7th Cir. 1981); *United States v. Long*, 651 F.2d 239, 241 (4th Cir. 1981); *United States v. Stratton*, 649 F.2d 1066, 1074 (5th Cir. 1981); *United States v. Clark*, 646 F.2d 1259, 1261–67 (8th Cir. 1981); *United States v. Bright*, 630 F.2d 804, 829 (5th Cir. 1980); *United States v. Altomare*, 625 F.2d 5, 7–8 (4th Cir. 1980); *United States v. Karas*, 624 F.2d 500, 504 (4th Cir. 1980), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981); *United States v. Baker*, 617 F.2d 1060, 1061 (4th Cir. 1980); *United States v. Bacheler*, 611 F.2d 443, 450 (3d Cir. 1979); *United States v. Grzywacz, supra*, 603 F.2d at 685–87 (7th Cir. 1979);

*United States v. Frumento, supra*, 563 F.2d at 1089–92 (3d Cir. 1977); *United States v. Brown, supra*, 555 F.2d at 415–16 (5th Cir. 1977); *United States v. Dozier*, 493 F.Supp. 554 (M.D.La.1980); *United States v. Barber, supra*, 476 F.Supp. at 184–85 (S.D.W.Va. 1979); *United States v. Sisk, supra*, 476 F.Supp. at 1062 (M.D.Tenn.1979); *United States v. Vignola*, 464 F.Supp. 1091, 1095–96 (E.D.Pa.1979), *aff'd mem.*, 605 F.2d 1199 (3d Cir. 1979); *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980); *United States v. Salvitti*, 451 F.Supp. 195, 199 (E.D.Pa.), *aff'd mem.*, 588 F.2d 824 (3d Cir. 1978).

The sheer number of these cases is imposing, and the metaphor of an avalanche is apt, for the practice of construing "enterprise" to include government entities has truly snowballed. Many of the cases above[5] simply cite earlier precedent without further considering the enterprise issue.

More important, in most of these cases the implications of RICO's remedies were either not raised or not considered. Two exceptions to this rule are *Angelilli, supra*, and *Barber, supra*. As noted above, we believe *Angelilli* misapplies the Supreme Court's statement in *Turkette* that "[i]t is untenable to argue that [the existence of RICO's remedies] limits the scope of the criminal provisions." *See* 600 F.2d at 34 (quoting 452 U.S. at 585, 101 S.Ct. at 2530). This is not, like *Turkette*, a case where certain remedial provisions are simply not feasible, but one where their application would raise grave constitutional questions. As the Supreme Court has often counseled us to do, we adopt a narrower reading of the statute in order to avoid these constitutional doubts. *See, e.g., Cali-*

---

4. This distinction between government and private enterprises in cases involving government officials has been overlooked by courts that cite *Whitehead* and *Herman* as "government-enterprise" cases. *See United States v. Lee Stoller Enterprises, Inc.*, 652 F.2d 1313, 1318 n.9 (7th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981) (so citing *Herman*); *Angelilli, supra*, 660 F.2d at 33 (so citing *Whitehead*).

5. *E.g., Sutherland, Stratton, Altomare, Karas, Baker, Bacheler, Dozier* and *Vignola*. One of

the earliest cases in the Court of Appeals that applied RICO to government entities, and one on which many of the later cases rely, is *Frumento*. On its facts, *Frumento* is arguably limited to "state operated commercial ventures engaged in interstate commerce, or other governmental agencies regulating commercial and utility operations affecting interstate commerce." 563 F.2d at 1091 (footnote omitted). It is a considerable leap from *Frumento* to apply RICO indiscriminately to every government enterprise.

*fano v. Yamasaki,* 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979); *Lynch v. Overholser,* 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962).

An alternative would be to follow the lead of the other court that expressly addressed the implications of RICO's remedies and hold that because these remedies are discretionary, "[t]here is no binding correlation between Title IX's remedial options and the question of whether Congress intended to omit public entities from the meaning of enterprise." *Barber, supra,* 476 F.Supp. at 189. Yet the grant of an "unthinkable" (*id.*) remedial power cannot be ignored because its exercise is discretionary. There is an anomaly within RICO, and it must be dealt with: either RICO's definition of enterprise or its remedial provisions must be modified if each is to accommodate the other in this case.

The legislative history convinces us that it is the definition of enterprise that should yield. Congressional debates clearly indicate that what was considered important and novel in Title IX was the provision of new remedies for dealing with organized crime. *See* Remarks of Sen. McClellan, 116 Cong.Rec. 591; Remarks of Sen. Hruska, *id.* at 602 ("[T]he principal value of this legislation may well be found to exist in its civil provisions which employ the time-tested antitrust remedies of injunction, divestiture, dissolution, and reorganization . . . ."); Remarks of Sen. Byrd, *id.* at 607. *See also* McClellan, *supra,* 46 Notre Dame Law. at 191.

It is the existence of these novel remedies that distinguishes RICO from more traditional means of attacking corruption in government (such as the Hobbs Act, 18 U.S.C. § 1951) and that renders RICO's application to a government entity inappropriate.

After the avalanche, it is time for the spring thaw. The judgments of conviction are vacated.