UNITED STATES of America, Appellee,

v.

Rudolph SEDOVIC a/k/a Rudy Sedovic, Appellant.

No. 80–2080.

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1981.

Decided June 7, 1982.

Arthur S. Margulis, St. Louis, Mo., for defendant-appellant.

Robert D. Kingsland, U. S. Atty., Edward L. Dowd, Jr., Asst. U. S. Atty., Thomas E. Dittmeier, U. S. Atty., St. Louis, Mo., for appellee.

Before HEANEY, HENLEY * and McMILLIAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Rudolph Sedovic appeals from a final judgment entered in the District Court [1] for the Eastern District of Missouri after a bench trial finding him guilty of three counts of mail fraud in violation of 18 U.S.C. § 1341. The district court sentenced appellant to a total of two years imprisonment and five years probation. For reversal appellant argues that the district court erred in (1) admitting evidence produced by court-authorized electronic surveillance, (2) finding sufficient use of the mails, and (3) finding that appellant "devised" the scheme to defraud. For the reasons discussed below, we affirm the judgment of the district court, 500 F.Supp. 515.

Appellant was the chief auditor in the License Collector's Office of the City of St. Louis from 1975 through mid-1979. In July, 1979, appellant was indicted for mail fraud. The indictment charged appellant

---

\* The Honorable J. Smith Henley assumed senior status on June 1, 1982.

1. The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri.

with helping businesses unlawfully obtain city business licenses on the basis of false business tax returns. Under the scheme businesses submitted false business tax returns by reporting reduced inventory, production, and sales figures. In exchange for gifts or cash, appellant conducted sham tax audits for the License Collector's Office. Upon completion of the sham audit and payment of a reduced tax, the License Collector's Office then mailed a city business license to the particular business.

## I. *Electronic Surveillance*

██ Appellant first argues that the district court erred in admitting into evidence thirteen recorded conversations obtained as a result of two court-authorized periods of electronic surveillance of the License Collector's Office during the late spring of 1979. Having received prior authorization from the Assistant Attorney General, the government requested the first electronic surveillance order on April 25, 1979. The government's application was supported by the detailed affidavit of FBI Special Agent Martin J. Weber. The authorizing district judge[2] found there was probable cause to believe that appellant, others named in the application, and persons unknown in the License Collector's Office had committed

and were committing offenses involving extortion by public officials, bribery, racketeering, mail fraud, obstruction of justice, and conspiracy to commit those offenses. The district court then granted the government's application for twenty days of electronic surveillance, with periodic progress reports. On May 21, 1979, upon application by the government, the district judge authorized continued electronic surveillance for an additional thirty days, subject to periodic progress reports.

Appellant argues that electronic surveillance was unlawfully used to investigate an offense—mail fraud—not specifically listed in 18 U.S.C. § 2516. We disagree. As in a similar case decided by this court, *United States v. Daly*, 535 F.2d 434 (8th Cir. 1976), "[w]e find that [electronic surveillance] may be used to investigate mail fraud under certain circumstances present in this case." *Id.* at 439.[3]

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, imposes a general ban on the electronic interception and disclosure of wire and oral communications, but it authorizes electronic interception, upon prior application and approval by a judge of competent jurisdiction, by state or federal law

---

**2.** The Honorable H. Kenneth Wangelin, Chief Judge, United States District Court for the Eastern District of Missouri, was the authorizing district judge for both the April and May electronic surveillance orders.

**3.** In *Daly* the government had uncovered an extensive racketeering operation involving the fraudulent use of credit cards in at least three states by normal investigative techniques. The government sought authorization to conduct electronic surveillance in order to discover critical information which had not been produced by undercover investigation. The district court granted two fifteen-day wiretap orders. In addition to discovering critical information as a result of the wiretaps about the credit card fraud, which presumably was the basis of Daly's guilty plea to racketeering charges, the government also discovered evidence that established that on three separate occasions Daly and three other persons had engaged in schemes to defraud insurance companies by submitting false claims for theft losses. This evidence was the basis for Daly's mail fraud prosecution. On appeal Daly unsuccessfully

argued that electronic surveillance had unlawfully been used to investigate mail fraud, a crime for which electronic surveillance is not authorized in 18 U.S.C. § 2516. *United States v. Daly*, 535 F.2d 434, 439 (8th Cir. 1976).

In *Daly* the wiretap order specified as the offenses under investigation 18 U.S.C. § 1341 (mail fraud) and §§ 1962(c), 1962(d), and 1963 (racketeering). *Id.* at 440 n.6. As discussed above, Daly was convicted of *insurance* mail fraud, although the wiretap orders had been authorized on the basis of racketeering activity involving *credit card* mail fraud. Thus, there was an apparent discrepancy between the crime under investigation and the crime charged. The court, however, determined that this discrepancy was without significance under the circumstances. *Id.* at 440 & nn.5 & 6.

The present case involves only the offense of mail fraud. We do not address the possible scope of the relationship, if any, between the other predicate offenses of RICO listed in 18 U.S.C. § 1961(1)(B) and the electronic surveillance authorization statute, 18 U.S.C. § 2516.

enforcement officers investigating particular offenses listed in 18 U.S.C. § 2516. By developing such a list of offenses, Congress intended to restrict the government's use of electronic surveillance in the investigation of crime to particular offenses which involve national security or are "intrinsically serious or . . . characteristic of the operations of organized crime." S.Rep.No.90–1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News 2112, 2186; *see* 18 U.S.C. § 2516(1).

Appellant correctly argues that mail fraud, 18 U.S.C. § 1341, is not listed in 18 U.S.C. § 2516. Thus, the government could not have received authorization to conduct electronic surveillance on the basis of probable cause of mail fraud alone. However, as held in *Daly*, the government may lawfully use evidence of mail fraud—an offense not listed in 18 U.S.C. § 2516— obtained by electronic surveillance where the electronic surveillance was authorized to investigate racketeering involving mail fraud. 535 F.2d at 439. In the present case, as in *Daly*, the government sought to investigate mail fraud in connection with racketeering offenses in violation of Title IX of the Organized Crime Control Act of 1970, Pub.L.No.91–452, § 901(a), 84 Stat. 941 (1970), *codified at* 18 U.S.C. §§ 1961–1968. Title IX is popularly known as the Racketeer Influenced and Corrupt Organizations Act or RICO.

Section 2516, as amended in 1970, includes within the list of specific offenses for which interception of wire [and oral] communications is permitted, the activities penalized by 18 U.S.C. § 1963. . . . Section 1963 penalizes any pattern of racketeering activity affecting interstate commerce proscribed by 18 U.S.C. § 1962. Section 1961(1)(B), which defines the activities subject to the racketeering provisions, specifically refers to the mail fraud statute, 18 U.S.C. § 1341. [Mail fraud is a predicate offense for RICO purposes. *See* 18 U.S.C. §§ 1961(1)(B), 1961(5), 1962(c).]

Thus, [the district court's] order permitted interceptions specifically authorized by section 2516—interceptions of conversations relating to mail fraud racketeering activities violative of 18 U.S.C. §§ 1961 *et seq.*

*United States v. Daly, supra,* 535 F.2d at 439.

In addition, we note that appellant does not challenge the district court's finding of probable cause to believe that appellant and others had committed and were committing offenses involving extortion, bribery, racketeering, mail fraud, obstruction of justice, and conspiracy. We have reviewed the government's electronic surveillance application and supporting affidavit and agree with the district court's finding of probable cause. In particular we note that appellant was convicted of participation in precisely the mail fraud scheme involving the handling of city business licenses by the License Collector's Office described in the application and supporting affidavit. In fact, at trial three specific instances of mail fraud were proven.

█ In both *Daly* and the present case evidence obtained as a result of electronic surveillance authorized to investigate racketeering activity involving mail fraud was introduced in a prosecution for mail fraud. *See id.* at 440 n.6. We do not find *Daly* distinguishable from the present case on the ground that in *Daly*, in addition to being charged with mail fraud, the defendant had earlier "pleaded guilty to participating in a pattern of racketeering under § 1962(c) *as a result of the wiretap.*" *Id.* at 439 (emphasis in original). Here, although appellant was not charged with racketeering, racketeering was one of the offenses under investigation. The decision to charge a particular defendant with one offense and not another is a matter within the discretion of the prosecuting authorities. This is especially true in racketeering investigations because racketeering is a crime composed of predicate offenses. 18 U.S.C. §§ 1961(1)(B), 1961(5), 1962(c); *e.g., United States v. Anderson,* 626 F.2d 1358, 1362–64 (8th Cir. 1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981).

In view of our holding that the district court did not err in admitting evidence of mail fraud obtained as a result of electronic surveillance authorized to investigate racketeering activity involving mail fraud, we do not reach appellant's alternative argument that disclosure of the mail fraud evidence was not authorized by 18 U.S.C. § 2517(5).[4]

## II. Use of Mails as Integral Part of Scheme

■ Appellant next argues that the district court erred in finding that the use of the mails was an integral part of the scheme or artifice. Appellant contends that because the mailings upon which the government relies occurred *after* the alleged receipt of payment, the mails were not used in furtherance of the scheme but were merely collateral or incidental to it. In support of his argument appellant relies upon *United States v. Edwards*, 458 F.2d 875, 880–83 (5th Cir.), *cert. denied*, 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148 (1972), which held that a clear and definite relationship must exist between the fraudulent scheme and the use of the mails.[5]

To establish a violation of § 1341[6] the government must prove a scheme to de-

4. Appellant alternatively argues that the evidence of mail fraud was evidence of a crime other than the crime upon which the electronic surveillance order was premised and therefore was not admissible absent prior court approval under 18 U.S.C. § 2517(5). Appellant argues that the government did not obtain the mail fraud evidence inadvertently because mail fraud was a focus of the government investigation from the beginning. The government argues that inadvertent interception of other crimes evidence is not required for court-ordered disclosure under 18 U.S.C. § 2517(5). We must disagree with the government's position:

> In enacting § 2517(5) as part of the comprehensive wiretap provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2515, *et seq.*, Congress sought to balance two conflicting principles. One is the necessity of protecting Fourth Amendment and privacy rights, which require scrupulous particularity as to the circumstances and reasons for an electronic search before permitting it to be authorized by the courts as a means of insuring that its scope will be limited and its invasion of privacy minimized. It was recognized that unless stringent detail were required the government might obtain an overly broad wiretap authorization for one offense as a pretext for gaining information with respect to offenses for which probable cause could not be established or for which wiretap authorization would be unavailable. The countervailing principle is that where a law enforcement officer lawfully engaged in a search for evidence of one crime inadvertently comes upon evidence of another crime the public interest militates against his being required to ignore what is in plain view. In permitting court authorization for electronic interceptions in investigations into certain types of crime, Congress provided that the court authorization must specify the offenses in connection with which the permission was granted and, should the law enforcement officer, in the course of conducting the authorized interception, come across communications relating to offenses other than those specified in the order of authorization or approval, he must obtain the authorization or approval of a court of competent jurisdiction as soon as practicable before the communications might be used in connection with the unspecified offense. 18 U.S.C. § 2517(5).
> . . . .
> Congress intended that judicial approval of the interception of evidence relating to unauthorized offenses might retroactively be granted pursuant to § 2517(5) upon a showing that
> > the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.

*United States v. Masciarelli*, 558 F.2d 1064, 1066–68 (2d Cir. 1977) (citations and footnotes omitted), *citing* S.Rep.No.90–1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News 2112, 2189. *See also United States v. Cox*, 449 F.2d 679, 683–87 (10th Cir. 1971), *cert. denied*, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972); *United States v. Tortorello*, 342 F.Supp. 1029, 1038 (S.D.N.Y.1972), *aff'd*, 480 F.2d 764 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *see generally* J. Carr, The Law of Electronic Surveillance § 5.09–.12 (1977).

5. *See also United States v. Brown*, 583 F.2d 659, 664–66 (3d Cir. 1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979) (mailings taking place after the object of the scheme has been accomplished are not sufficiently related to the plan to support a mail fraud conviction).

6. 18 U.S.C. § 1341 states in relevant part:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for

fraud and the mailing of a letter or other instrument for the purpose of executing the scheme. Although "it is not necessary that the scheme contemplate the use of the mails as an essential element," it is necessary for the mailings to be "sufficiently closely related to [appellant's] scheme to bring his conduct within the statute." If the appellant's scheme reached fruition prior to the mailings as did the respondent's in *United States v. Maze,* [414 U.S. 395, 402, 94 S.Ct. 645, 649, 38 L.Ed.2d 603 (1974)], the mailings were not sufficiently related to the scheme to bring his conduct within the statute. *United States v. Cooper,* 596 F.2d 327, 329 (8th Cir. 1979) (citations omitted).

Appellant's argument fails because, although he had been paid prior to the mailing of the bogus business licenses, the scheme was not complete until the merchants or manufacturers were in receipt of their licenses. *United States v. Edwards, supra,* 458 F.2d at 883–85, is distinguishable because the transactions in that case did not involve an ongoing series of fraudulent representation on the part of both the dispatcher and the receiver of the mails.

The Eighth Circuit has said that the federal mail fraud statute is to be read "expansively," *United States v. Cady,* 567 F.2d 771, 775 (8th Cir. 1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978); *United States v. McNeive,* 536 F.2d 1245, 1247 (8th Cir. 1976). In the case at bar the evidence showed that the use of the mail was an integral part of the fraudulent scheme to obtain business licenses at an illicitly reduced rate. The use of the mail,

through which payments were received and business licenses were dispatched, was a critical step in the process of issuing business licenses.

We believe the district court correctly found[7] the mailings charged were used for the purpose of executing the fraudulent scheme.

### III. *Appellant Devised the Scheme to Defraud*

As his final argument appellant asserts that the district court's finding that appellant devised the scheme to defraud was not supported by sufficient evidence. We disagree.

 In addition to establishing the existence of a scheme to defraud, it is also necessary that the government prove that the defendant was a part of that scheme. *United States v. Pearlstein,* 576 F.2d 531, 534 (3d Cir. 1978). Under the mail fraud statute, proof is required of specific intent, *United States v. Payne,* 474 F.2d 603, 604 (9th Cir. 1973); however, "[i]t is not necessary for the government to prove that [the defendant] was one of those who originally devised the scheme. When [the defendant] joined in the . . . misrepresentations and deceptions . . . he brought himself within the provisions of the statute." *Reistroffer v. United States,* 258 F.2d 379, 395 (8th Cir. 1958), *cert. denied,* 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959).

 In this case it is conceded in appellant's brief "that a scheme existed." While the evidence does not establish that appel-

---

obtaining money or property by means of false or fraudulent pretenses, . . . for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

7. The district court held that

[t]he [three] mailings . . . were an integral part of the defendant's scheme to defraud since they each represented a critical step in the business licensing process. Without the mailing of a tax payment or the license itself, the objective of securing a business license at an illicitly reduced tax rate, with defendant's participation, could not have been achieved. *United States v. Sedovic,* 500 F.Supp. at 518 (E.D.Mo.1980).

lant conceived the scheme, there is substantial evidence that appellant joined in the scheme with knowledge of its fraudulent elements and that the scheme was furthered as a result of his involvement.[8] Shortly after appellant became employed at the License Collector's Office in 1975, appellant played a key role in fraudulent preparation of the corporate tax returns. While there is some evidence to support appellant's claim that he was encouraged by his superiors to participate in the fraudulent scheme, the evidence was sufficient to establish that his continued participation as a director of the scheme was completely voluntary. The practice of sending city auditors to assist taxpayers in the preparation of bogus merchants and manufacturers tax returns did not originate with appellant; however, there was substantial evidence that appellant played a decision making role in the overall evolution of the fraudulent scheme.

## IV. Conclusion

We conclude that the district court did not err in (1) admitting into evidence the results of the electronic surveillance, (2) finding that the mails were an integral part of appellant's fraudulent scheme, and (3) finding that appellant "devised" the scheme to defraud as required by 18 U.S.C. § 1341.

Accordingly, the judgment of the district court is affirmed.

HEANEY, Circuit Judge, concurring.

I write separately simply to express my concern that the government's application for an order authorizing electronic surveillance and supporting affidavits do not establish probable cause to believe that the appellants had violated and were violating RICO. The application and affidavits allege a pattern of racketeering involving mail fraud conducted through the License Collector's Office of the City of St. Louis. This Court, in affirming the district court's finding of probable cause, implicitly assumes that the License Collector's Office is an "enterprise" within the meaning of RICO's prohibition against conducting the affairs of an enterprise through a pattern of racketeering. I disagree with this assumption because, in my view, governmental entities are not "enterprises" under RICO. I agree with Judge Peck, writing for the Sixth Circuit in *United States v. Thompson*, 669 F.2d 1143, 1149 (6th Cir. 1982), that it is "a perversion of Congress's intent to continue to allow the potent weapons created in RICO to be lifted casually against every instance of venality in state and local governments."

As Judge Peck notes, passage of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961–1968 (1976), of which RICO is a part, did result to some extent from Congressional concern with corruption of government by organized crime. It is clear, however, that RICO itself was aimed at the *economic* power of organized crime. The remarks of Senator Byrd are illustrative:

Another section of the bill which merits special attention, Mr. President, is title IX.

Recent studies of the phenomenon of organized crime, including that of the National Crime Commission, have identified its alarming expansion into the field of legitimate business as a major threat to our institutions. This penetration of legitimate business by organized crime poses two distinct but related dangers:

First, the economic strength of the underlying illegal operations of organized crime is perpetuated and made more profitable if tainted proceeds can be safely invested in legitimate enterprises, even if those enterprises are operated in a lawful manner.

---

**8.** The "devise" element of § 1341 is closely related to but distinguishable from the "intent" element required to establish mail fraud. *Cf. Gusow v. United States*, 347 F.2d 755, 756 (10th Cir.), *cert. denied*, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965) (an essential element of § 1341 is the "intentional devising of a scheme to defraud"). *See Hofmann v. United States*, 353 F.2d 188, 191 (10th Cir. 1965) (although "the fraudulent scheme had been devised prior to defendant's involvement," the accused was within the purview of the mail fraud statute).

Second, the free channels of trade are threatened by organized crime's propensity to obtain for itself monopoly control of its areas by whatever means are available, including brutal and strongarm tactics.

The techniques and methods used in such infiltration of legitimate business enterprises are many and varied. A few case histories will demonstrate how easily a business can fall captive to its awesome power.

\* \* \* \* \* \*

The legislative proposals contained in title IX of this act, entitled "Racketeer Influenced and Corrupt Organizations," constitute a carefully structured program which can drastically curtail—and eventually eradicate—the vast expansion of organized crime's economic power which operates outside the rules of fair competition of the American marketplace. Broadly speaking, this title would create strict criminal penalties for using the proceeds of racketeering activity characteristic of organized crime to acquire an interest in businesses engaged in interstate commerce, or to acquire or operate such businesses by racketeering methods.

116 Cong.Rec. 606–607, *quoted in United States v. Thompson, supra,* 669 F.2d at 1147–1148.

Judge Peck further notes the anomalous result of applying the Act's remedial provisions to violations involving governmental entities. The Act empowers the court, *inter alia,* to "[prohibit] any person from engaging in the same type of endeavor as the enterprise engaged in" and to "[order] dissolution or reorganization of any enterprise." 18 U.S.C. § 1964(a) (1976). It would, of course, be absurd to hold that Congress *sub silentio* granted the district courts such authority vis-a-vis state and local governments. I accordingly agree with Judge Peck's conclusion that the presence of these remedies in the Act, and their apparent importance to its novelty and efficacy, reveal that "government entities are neither appropriate nor intended RICO 'enterprises.'" *United States v. Thompson, supra,* 669 F.2d at 1148.

I am aware that this Circuit has held to the contrary in *United States v. Clark,* 646 F.2d 1259, 1264 (8th Cir. 1981). I find the reasoning of the Sixth Circuit's *Thompson* decision more persuasive, however. The *Clark* Court concludes that because the pertinent statutory language does not distinguish between public and private "legal entities," and because Congress failed to use terms such as "private," "business" or "commercial" enterprises, the statute necessarily applies to governmental entities. In my view, this approach is overly simplistic and results in an extension of the Act beyond its intended scope.

Although I do not agree with the majority that probable cause existed to believe that RICO violations were being committed, appellant Sedovic did not challenge that probable cause finding in the court below. Accordingly, I join in the Court's opinion upholding the use of mail fraud evidence obtained as a result of investigating the alleged racketeering offenses.

**UNITED STATES of America, Appellee,**

v.

**William E. BOYKIN, Appellant.**

No. 81–1965.

United States Court of Appeals, Eighth Circuit.

Submitted March 10, 1982.

Decided June 9, 1982.

James R. Wyrsch, Kansas City, Mo., for appellant.

Robert G. Ulrich, U. S. Atty., Carol Ann Petren, Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before ROSS, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

William E. Boykin was convicted of five counts of mail fraud under 18 U.S.C. § 1341. He was sentenced to confinement, study, and observation under the provisions of 18 U.S.C. § 4205(d). He here alleges that five errors in the trial merit reversal on appeal. We affirm Boykin's conviction.

## I.

The evidence at trial established the following. Boykin became friendly with one Isaac Kyle sometime in 1976. Kyle worked as an insurance agent with Allstate Insurance for approximately two years during 1977–1979.

In 1977, Kyle sold a lot with a house on it, located at 5820 Virginia, Kansas City, Missouri, to appellant Boykin. According to Kyle's testimony, Boykin planned to sell the property to Boykin's girlfriend, Antoinette Nizetich, allow her to live there for a while, and then set the property on fire. Boykin did subsequently sell the property to Nizetich and Nizetich insured it for $30,000.

According to Kyle's testimony, on or about October 15, 1978, Boykin called Kyle and said it was time to set fire to the house. Nizetich, a TWA flight attendant, had informed Boykin that she would be out of her house that day.

Kyle detailed at trial how the fire was set by Boykin and him by pouring gasoline in the house and igniting it with a match. He testified that immediately after the house was set afire, he went with Boykin to a bank where Boykin withdrew $100 from an automatic teller and gave it to Kyle for his help in setting the fire. Since Boykin had offered $600 to Kyle in exchange for Kyle's help in setting the fire, another $500 was paid to Kyle by Boykin in December 1978, with a personal check.

Some days after the fire was set, Boykin loaned Kyle $5,000. A few days later he loaned him another $4700. When Boykin demanded repayment, Kyle gave him a check which failed to clear because of insufficient funds. Boykin consequently filed a complaint with the prosecutor against Kyle. Kyle sent his brother to Boykin's house to retrieve the check. The brother and two of his companions broke into Boykin's home on two occasions. The first time, they burglarized Boykin's home. The second time, they physically abused Boykin, threatened to kill him and his family, and tied up Boykin's children.

The sale of the property at issue here from Boykin to Nizetich was never reduced to writing in the form of a written agreement. Kyle had previously purchased this property for $4500 in June 1977 and had sold it to Boykin in October 1977 for $6500. Boykin then sold the property to Nizetich, as evidenced by a deed of trust dated January 10, 1978, from Nizetich to Boykin. Nizetich testified at trial that she never requested a writing of any form because she totally trusted Boykin. Nizetich made a downpayment of $2000 on the home when she purchased it in January 1978, and she agreed to pay Boykin $210 per month. In fact, she did not make regular payments to Boykin but, according to her testimony, would purchase items for Boykin while traveling and deduct the cost of them from what she owed him. Nizetich did not divulge Boykin's interest in the property on her application for insurance on the home.

The day after the fire, Nizetich reported the loss to her insurance company. She filed the claim in her own name only and again did not divulge Boykin's interest. Out of the insurance proceeds which Nizetich collected for the fire damage, she paid $13,250 to Boykin.

On March 9, 1981, both Boykin and Isaac Kyle were separately indicted on charges of mail fraud stemming from fraudulent insurance claims. Isaac Kyle pled guilty to one of the five counts in his indictment and agreed to cooperate with the authorities by providing information regarding various fraudulent insurance claims, including the one here at issue.

Much of Kyle's testimony was independently corroborated by other evidence and witnesses including police investigators, fire officers, and a bank officer. Boykin testified on his own behalf and denied participating in any way in the arson.

II.

Boykin first alleges that the court erred in permitting cross-examination of him regarding his relationships with two women, Ms. Nizetich and a Carletta Elsworth. The challenged line of questioning indicated that Boykin was dating both women at the same time.

Boykin claims that the evidence was irrelevant and immaterial. He further claims that the evidence should have been excluded by Fed.R.Evid. 403,[1] 404(b),[2] and 608(b).[3] We disagree.

1. Rule 403 provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

2. Rule 404(b) provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive,

3. See note 3 on page 1244.

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.